David S. Stone
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (973) 218-1106
dstone@stonemagnalaw.com
*Attorneys for Plaintiff*

| | | |
|---|---|---|
| JOSEPH PIACENTILE, M.D., J.D., an individual residing in the Commonwealth of Puerto Rico, | : : : : : | UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK |
| Plaintiff, | : : | |
| v. | : : | Civil Action No.: 1:20-cv-05252-JMF |
| JEREMY TROXEL, Esq., a New York licensed attorney currently residing in California; and JONATHAN RUBLEE, an individual residing in Pennsylvania, | : : : : : : | **FIRST AMENDED COMPLAINT** JURY TRIAL DEMANDED |
| Defendants. | : | |

Joseph Piacentile, M.D., J.D., ("Dr. Piacentile"), an individual residing in the Commonwealth of Puerto Rico and a partner in a District of Columbia Limited Liability Partnership named Troxel, Krauss & Chapman, LLP ("TKC LLP"), by his undersigned attorneys, hereby brings this First Amended Complaint against Defendants Jeremy Troxel, Esq. ("Troxel"), a New York licensed attorney currently residing in California and a partner with Dr. Piacentile in TKC LLP; and Jonathan Rublee ("Rublee"), an individual residing in Philadelphia, Pennsylvania (collectively "Defendants").

1

## FACTUAL ALLEGATIONS

1. Dr. Piacentile, an individual residing in San Juan, Puerto Rico, is a semi-retired medical doctor, recent New York Law School graduate, and renowned whistleblower advocate who has spent the last thirty years specializing in assisting clients who blow the whistle on fraud against the Government. Often this fraud will be in the healthcare setting, specifically fraud against the Medicare and Medicaid programs.

2. Dr. Piacentile began as an individual whistleblower using his knowledge of the healthcare and pharmaceutical industries to ferret out and reveal fraud.

3. Using the proceeds obtained from awards garnered through successful whistleblower cases, Dr. Piacentile established an organization – Whistleblowers Against Fraud ("WAF") – which has for many years assisted heroic whistleblowers in developing and bringing successful whistleblower cases under federal and state whistleblower laws and helped recover hundreds of millions of dollars for state and federal governments.

4. Dr. Piacentile met Troxel, a New York licensed attorney currently working and residing in California, approximately six years ago when he began dating Dr. Piacentile's daughter. At the time, Troxel was a recent law school graduate who was working as an associate at the Morelli Law Firm in New York City.

5. Shortly thereafter, Troxel was terminated for performance reasons by the Morelli Law Firm.

6. Wanting to assist his daughter's boyfriend, Dr. Piacentile leveraged his personal connections to assist Troxel with obtaining a position as an associate at Lieff Cabraser Heimann & Bernstein, LLP in New York City.

7. Approximately one year later, Dr. Piacentile received a telephone call from Steven E. Fineman, Managing Partner of the Lieff Cabraser firm. Mr. Fineman told Dr. Piacentile that he was calling him, as a courtesy, to let him know that the firm intended to terminate Troxel for performance reasons. Dr. Piacentile asked Mr. Fineman to hold off on terminating Troxel for a short period of time so that Dr. Piacentile could help effectuate a graceful exit for Troxel so as to avoid another stain on his professional resume.

8. In or about September 30, 2016, pursuant to the laws of the District of Columbia, Dr. Piacentile collaborated with Brian Krauss, Esq. ("Krauss"), to form a new law firm: The Brian Krauss Law Firm, d/b/a Whistleblowers International ("WBI").

9. At the time, the District of Columbia was the only jurisdiction in the continental United States that allowed non-attorney professionals to join with licensed attorneys in the formation of a law firm, and to share in the revenues of the law firm as partners therein.

10. With WBI being formed, and Dr. Piacentile still believing in Troxel's abilities as a lawyer, Dr. Piacentile offered Troxel a lifeline – Dr. Piacentile would allow Troxel to come and work for him as an attorney at the WBI firm while Dr. Piacentile used his professional connections and his own personal funds to establish Troxel with a separate District of Columbia law firm that would specialize in plaintiff-side personal injury work focused on class action arbitrations and mass torts. All Dr. Piacentile required was a share of the ownership equity of the new firm, and the return of his substantial investment once TKC LLP began receiving revenues from successful litigations.

11. Dr. Piacentile made Troxel this offer because Dr. Piacentile believed that Troxel's knowledge of social media marketing made him a potentially successful plaintiff-side lawyer.

12. To establish this new firm with Troxel, Dr. Piacentile would rely on his then-law partner, Brian Krauss, and long-time colleague attorney Kirk Chapman.

13. Thus, despite the fact that Troxel had never risen above the associate level, was still freshly out of law school, was terminated by the Morelli firm and required Dr. Piacentile to offer him an escape hatch to avoid being terminated by the Lieff Cabraser firm, Dr. Piacentile offered to make Troxel a named partner in a new firm that would specialize in class action arbitration and mass torts.

14. To that end, Dr. Piacentile invested $500,000 of his own money in the creation of TKC LLP, a District of Columbia limited liability partnership. TKC LLP was formed on Oct 24, 2017.

15. Part of this funding was used by TKC LLP and its Managing Partner, Troxel, to hire Rublee in December 2017, an independent marketing expert who was to assist TKC LLP with the recruitment of clients who had been injured in mass tort situations. Dr. Piacentile also used his personal and professional connections to obtain additional outside investment in TKC LLP, in the hopes that Troxel and Rublee would work together to create a thriving mass tort firm. Specifically, not only did Dr. Piacentile invest $500,000 of his personal funds to create and operate TKC LLP, he also persuaded an attorney investor to personally invest an additional $800,000 in TKC LLP.

16. Upon the creation of TKC LLP, partners Troxel, Krauss, and Dr. Piacentile agreed to an even 1/3 split – with partner Chapman receiving a nominal share of the newly formed entity. Troxel, however, refused to memorialize this understanding in writing.

17. Indeed, during these many months that TKC LLP had been in operation, although Troxel clearly acknowledged that Dr. Piacentile and Krauss were partners of the firm, he refused

to execute any formal, written partnership agreement. Nor would he sign any drafts of the various partnership documents that were circulated throughout the time that he was accepting compensation as the managing partner of TKC LLP. Troxel even refused to provide his Social Security number that was needed for tax reasons on many occasions.

18. For a period of time, it appeared that Dr. Piacentile's investment was paying off. TKC LLP was successfully recruiting clients and filing cases, while co-counseling with other respected plaintiffs' law firms. Dr. Piacentile opened up his extensive business contacts list to Troxel and funded Troxel's trips to conventions to ostensibly learn social media marketing for law firms.

19. However, in or about early 2019, Troxel (who had been operating and doing business in New York City for all times relevant to this complaint) abruptly announced that he intended to move from New York to California with Dr. Piacentile's daughter. This announcement came as a complete surprise to Dr. Piacentile and Krauss.

20. What Troxel did not tell Dr. Piacentile, and upon information and belief, Krauss, was that even though he continued to receive monthly compensation as the managing partner of TKC LLP and to use TKC LLP funds to pay Rublee, he had in fact established a new New York (Troxel LLP, formed April 5, 2019) and Puerto Rico based law firm (Troxel LLC, formed July 8, 2019) owned solely by him, and was working on behalf of that new law firm and soliciting clients on behalf of that law firm.

21. In addition, Rublee and Troxel were to create a new, unique and patentable method to market for law firm clients. Dr. Piacentile even arranged a meeting with a managing partner at Moses & Singer LLP for the sole purpose of structuring a buyout and an end-game for a takeover once this method, which Dr. Piacentile paid for, was registered with the USPTO as a

5

business process. Dr. Piacentile, through his investment in TKC LLP, Troxel and Rublee, paid for the development of that method.

22. Instead, Troxel was using TKC LLP funds to pay Rublee to carry out social media marketing campaigns for his new firm, Troxel LLP/LLC, and identifying clients and cases for that new firm. Some evidence of this is the fact that it was only after Dr. Piacentile and Krauss discovered the existence of Troxel LLP/LLC that Rublee modified his LinkedIn professional page. Previously, Rublee had identified himself as a marketing officer for Troxel LLC, however upon information and belief, when he learned that Dr. Piacentile had viewed Rublee's LinkedIn page (Rublee received an automatic notification from LinkedIn of Dr. Piacentile's inquiry), Rublee deleted Troxel LLC from his LinkedIn page to cover up the fact that he had been working for Troxel LLC while being paid by TKC LLP.

23. Particularly significant is that in his rush to create a new, competing law firm, Troxel apparently did not take the time to seek admission to the Bar of California, yet was practicing law by recruiting and signing retainers with **thousands** of mass tort claimants while working and residing in California. A search of the California State Bar attorney lookup web-page confirmed that as of July 6, 2020, Troxel was still not a California licensed attorney

24. Upon information and belief, and despite not having a California law license, Troxel (living and working in California) through the use of automated retainers, text messages and electronic signatures, has been retained by literally thousands of new clients for mass tort/class action arbitration matters.

25. This method of client procurement and attorney retention has resulted in possible ethical violations by Troxel. Specifically, in *Terrell Abernathy, et al., v. Doordash, Inc.*, Case No. 3:19-cv-07545-WHA, 3:19-cv-07646-WHA (N.D. Cal. 2020), Richard Zitrin, a professor of

legal ethics at the University of California, Hastings College of Law, was retained as an expert by the Gibson Dunn firm and filed a declaration with the Northern District of California Court whereby Professor Zitrin explained deficiencies with Troxel's retainer agreements and those of his co-counsel Keller Lenkner. A true and genuine copy of the Zitrin Declaration is attached hereto as **Exhibit A**.

26. Whether Troxel entered into similarly deficient retainer agreements with TKC LLP's numerous clients is unknown to Dr. Piacentile as Troxel refuses to provide his business partners with copies of TKC LLP's retainer agreements.

27. Troxel's efforts to feather the nest of his new law firm were not confined to improperly re-directing funds and clients ear-marked for TKC LLP. Indeed, Troxel went one step further – engaging in efforts to interfere with Dr. Piacentile's various business relationships so as to undermine TKC LLP and WBI, and promote the new Troxel firm.

28. Specifically, in an effort to obtain further financing for TKC LLP, Dr. Piacentile arranged a meeting for Troxel with one of Dr. Piacentile's business connections, Andy Brown. At this meeting and behind Dr. Piacentile's back, Troxel belittled and undermined Dr. Piacentile, telling Mr. Brown that "Joe Piacentile will be valueless in two years," thus laying the groundwork for, upon information and belief, potential future efforts that Troxel would make to persuade Mr. Brown to invest in Troxel's new firm as opposed to TKC LLP or WBI.

29. When Krauss and Dr. Piacentile discovered Troxel's deceptive conduct in or about March 2019, it became clear that TKC LLP would have to be wound down and liquidated.

30. Despite this hurtful betrayal, Dr. Piacentile wanted to preserve his relationship with Troxel, as he remained the long-term boyfriend of his daughter and a potential future son-in-law. Accordingly, Dr. Piacentile made several trips to California to meet with Troxel

personally in an attempt to reach an amicable end for TKC LLP that would allow Troxel to move forward with his new firm while protecting Dr. Piacentile's financial interests in the remaining TKC LLP cases.

31. Each time, Troxel gave the appearances of reaching a resolution with Dr. Piacentile, going so far as to agree to a simple, multi-point memorandum of understanding between the two men. However, when it would come time to execute an agreement, Troxel would go silent and fail to respond or provide his signature.

32. It was during this time that Troxel disavowed that Dr. Piacentile owned a 1/3 interest in TKC LLP, despite the parties' oral agreement, and instead claimed that Dr. Piacentile owned no share of the partnership.

33. Troxel, despite having left the WBI firm many months before and despite having abandoned TKC LLP, still had unauthorized administrator access to both the TKC LLP and WBI websites and emails, and during this time monitored Dr. Piacentile's personal and professional emails and re-directed to himself emails between the WBI law firm and its co-counsel, the Motley Rice LLC law firm ("Motley Rice"), regarding client matters that Troxel had no involvement in. Troxel would then intercept emails from Motley Rice to Dr. Piacentile and secretly forward those emails to Krauss, Dr. Piacentile's partner.

34. It was also during this time that Troxel further sought to destroy Dr. Piacentile and interfere with his business relationships by calling Don Migliori, a senior partner of Motley Rice, to try to convince Mr. Migliori to persuade Motley Rice that Dr. Piacentile was not competent and indeed it was Troxel and Krauss who were responsible for the successes of the WBI and TKC firms.

35. With Troxel blatantly violating his legal and ethical obligations to the law firm that bore his name and to his partner, Dr. Piacentile was forced to obtain outside counsel to assist him with reaching a negotiated settlement with Troxel for the wind down of TKC LLP.

36. Over a period of several months, Dr. Piacentile, Krauss and Troxel negotiated the terms of their settlement agreement. This culminated in a meeting on October 23, 2019 in Manhattan between Dr. Piacentile, Krauss and their respective counsel. Troxel also attended the meeting via telephone conference. At this New York meeting, the partners of TKC LLP reached a settlement agreement (the "TKC Settlement Agreement") which was executed on or about October 31, 2019, which provided for, among other things, the division of the partnerships' revenues, the eventual return of Dr. Piacentile's $500,000 initial investment through preferential distributions, and the provision of TKC LLP's case/client list so that Dr. Piacentile could monitor, audit, and protect his equitable and contractual interest in the attorneys' fees generated by pending TKC LLP cases.

37. The TKC Settlement Agreement is to be construed in accordance with the laws of the District of Columbia.

38. The TKC Settlement Agreement recognizes Dr. Piacentile's $500,000 investment in TKC LLP (and effects the immediate repayment of $80,000 of said investment – which Troxel had previously blocked Dr. Piacentile's access to –leaving a remaining liability of $420,000), as well as Dr. Piacentile's 30% interest in the future revenues of the firm.

39. The TKC Settlement Agreement requires that Troxel ensure that TKC LLP continue to maintain malpractice insurance, and that the partners share in the expense of same.

40. Dr. Piacentile has complied with all of his obligations under the TKC Settlement Agreement.

41. Although Troxel ultimately executed the TKC Settlement Agreement, it soon became clear not long after the ink was dry that Troxel did not intend to comply with many of the key provisions of the agreement.

42. Specifically, when TKC LLP's 2019 malpractice insurance was due to lapse, Troxel refused to obtain replacement malpractice insurance coverage for TKC LLP. Dr. Piacentile had to step in and bind coverage, and to this date despite his contractual obligation and the fact that he is the wind-up partner for TKC LLP, Troxel has refused to pay his share of the malpractice insurance for TKC LLP.

43. For year 2020, Troxel again was in dereliction of his duties as wind-up partner for TKC LLP, failing to bind malpractice coverage for the year. This time, Krauss stepped in and bound coverage, which Dr. Piacentile is assisting with the payment of. Again, Troxel played no role in obtaining coverage for the firm that bears his name and which he is the wind up partner of.

44. Although Troxel agreed to, and indeed reaffirmed via e-mail, that he would provide the client list and retainers as required by the TKC Settlement Agreement's Paragraph 7, over six months have expired since then and he has failed to do so despite numerous requests. Without access to a complete list of TKC LLP's cases and clients, Dr. Piacentile – a minority partner of the firm – is essentially locked out from the partnerships' most important books and records. He has no way of monitoring the status of TKC LLP's various cases to ensure that Troxel is abiding by the terms of the parties' agreement and paying out distributions appropriately.

45. This is particularly significant given that one of the law firms that TKC LLP collaborated with has recently settled numerous significant cases that were potentially TKC LLP

cases regarding the ride-share companies Uber and Lyft. Troxel has, to this date, refused to provide any confirmation to Dr. Piacentile regarding whether those cases are in fact TKC LLP cases and Troxel has not distributed any funds from those settled cases to TKC LLP partners.

46. Moreover, TKC LLP and its partners could be held liable for Troxel's legal malpractice for clients that Dr. Piacentile and Krauss are not even aware of because of Troxel's refusal to share the firm's client list. TKC LLP is still a law firm that exists and has duties to clients, yet Dr. Piacentile does not even know who those clients are.

47. Because Troxel has been unwilling to provide information regarding co-counsel and retainers, the only way for Dr. Piacentile to obtain this information is to bring this action and obtain this discovery from third parties – such as co-counsel and clients.

48. Based upon the fact that given his past conduct, anything provided by Troxel, even pursuant to a Court Order, is likely unreliable and less than trustworthy, the only way to know for certain the firm's current case list is to take discovery from co-counsel and obtain this information by way of disinterested third parties.

49. Injunctive relief and expedited discovery are necessary to ensure that Troxel does not further dissipate the assets of TKC LLP to Dr. Piacentile's detriment, and that he abides by the payout provisions of the TKC Settlement Agreement.

## **JURISDICTION**

50. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because this case is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

51. Venue is properly set in this District pursuant to 28 U.S.C. §1391(b) since Defendants transact business within this judicial district. Specifically, Defendant Troxel's new

11

firm, Troxel LLP, is a New York entity with offices purportedly in Brooklyn, New York. Defendant Rublee is, upon information and belief, contracted to perform services for Troxel and Troxel LLP. Likewise, a substantial part of the events giving rise to the claim occurred within this judicial district when Defendant Troxel was both working and residing in New York City prior to his move to California. Moreover, the October 23, 2019 meeting which led to the October 31, 2019 TKC Settlement Agreement was held in Manhattan.

52. This Court has personal jurisdiction over the Defendants because, as noted above, Defendants are present in the State of New York. Troxel is the owner of Troxel LLP, a New York entity with law offices purportedly in New York City. Rublee is an independent contractor who, upon information and belief, is contracted to perform services for Troxel LLP – a New York entity. Troxel himself resided and worked in New York City until 2019, and is a New York licensed attorney.

## CAUSES OF ACTION

### COUNT I
### INJUNCTIVE RELIEF
### Against All Defendants

53. The allegations set forth above in paragraphs 1 through 52 are incorporated by reference herein with the same force and effect as if set forth in full below.

54. By virtue of the foregoing, Dr. Piacentile has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against the Defendants.

55. Unless the Defendants are preliminarily and permanently enjoined from the foregoing conduct, Dr. Piacentile will be irreparably harmed by:

A. Being locked out from the books and records of TKC LLP such that Dr. Piacentile will lose his right to audit the ongoing operations of TKC LLP to determine whether he is due payment under the TKC Settlement Agreement;

B. A threat to the enforcement of reasonable contracts; and

C. Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

56. Dr. Piacentile has no adequate remedy available at law.

WHEREFORE, Dr. Piacentile respectfully requests that a Preliminary Injunction issue enjoining Defendants Troxel and Rublee, directly or indirectly, whether alone or in concert with others, from:

(a) Destroying, erasing, or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in computer media) in Defendants' possession, custody or control which pertain to Defendants' clients, or which relate to any of the events alleged in the Complaint in this action;

(b) And further ordering Troxel to immediately provide to Dr. Piacentile the case/client list required by Paragraph 7 of the TKC Settlement Agreement; and

(c) Further ordering Troxel to immediately cease taking any new clients in the name of TKC LLP, as the firm is in the wind-down process; and

(d) Any and all other such acts as this Court deems appropriate for injunctive relief.

## COUNT II
## BREACH OF CONTRACT
### Against Jeremy Troxel Only

57. The allegations of Paragraphs 1 through 56 are incorporated by reference herein with the same force and effect as if set forth in full below.

58. Defendant Troxel has breached the TKC Settlement Agreement with Dr. Piacentile by, among other things, failing to provide Dr. Piacentile with the case/client list required by Paragraph 7 of the TKC Settlement Agreement and by failing to reimburse Dr. Piacentile for Troxel's share of the TKC LLP malpractice insurance.

59. These are material terms of the TKC Settlement Agreement, and their violation has caused Dr. Piacentile ongoing harm.

60. Defendant Troxel is continuing to violate his contractual obligations under the TKC Settlement Agreement.

61. As a consequence of the foregoing, Dr. Piacentile has suffered and will continue to suffer irreparable harm and loss.

WHEREFORE, Dr. Piacentile requests a preliminary injunction as set forth above pending resolution of this litigation, and a judgment in Dr. Piacentile's favor and against Defendant Troxel in an amount to be determined at trial, exclusive of interest, reasonable attorneys' fees, and costs.

## COUNT III
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
### Against Jeremy Troxel and Jonathan Rublee

62. The allegations of Paragraphs 1 through 61 are incorporated by reference herein with the same force and effect as if set forth in full below.

63. As set forth above, Rublee was an independent contractor who was paid by Dr. Piacentile and the firm Dr. Piacentile is a partner of, TKC LLP, to provide services for the benefit of TKC LLP.

64. Instead, Defendants Troxel and Rublee re-directed Rublee's services for the benefit of Troxel LLP/Troxel LLC and Troxel individually, thereby interfering with Rublee's business and contractual relationship with TKC LLP and Dr. Piacentile, and causing TKC LLP to lose potential clients and revenues.

65. As a consequence of the foregoing, Dr. Piacentile has suffered and will continue to suffer irreparable harm and loss, primarily through the diversion of Rublee's valuable services for the benefit of Troxel LLP/Troxel LLC and Troxel, not TKC LLP.

WHEREFORE, Dr. Piacentile requests judgment in his favor and against Defendants Troxel and Rublee in an amount to be determined at trial, exclusive of interest, reasonable attorneys' fees, and costs.

## **COUNT IV**
## **UNJUST ENRICHMENT**
## **Against Jeremy Troxel and Jonathan Rublee Only**

66. The allegations of Paragraphs 1 through 65 are incorporated by reference herein with the same force and effect as if set forth in full below.

67. As set forth above, Rublee was an independent contractor who was paid by Dr. Piacentile and the firm Dr. Piacentile is partial owner of, TKC LLP, to provide services for the benefit of TKC LLP.

68. Instead, Defendants Troxel and Rublee re-directed Rublee's services for the benefit of Troxel LLP/Troxel LLC and Jeremy Troxel, thereby unjustly using funds that were for the benefit of TKC LLP and one of its partners, Dr. Piacentile.

69. Troxel and Rublee have failed to compensate or otherwise reimburse Dr. Piacentile for the funds he paid Rublee which were intended to cover services benefitting TKC LLP, not Troxel's wholly owned law firm, Troxel LLC.

70. As a consequence of the foregoing, Dr. Piacentile has suffered and will continue to suffer irreparable harm and loss, primarily through the diversion of Rublee's valuable services to the benefit of Troxel LLP/Troxel LLC and Troxel, not TKC LLP and Dr. Piacentile.

WHEREFORE, Dr. Piacentile requests judgment in his favor and against Defendants Troxel and Rublee in an amount to be determined at trial, exclusive of interest, reasonable attorneys' fees, and costs.

## COUNT V
## USURPATION OF PARTNERSHIP OPPORTUNITIES
### Against Jeremy Troxel Only

71. The allegations of Paragraphs 1 through 70 are incorporated by reference herein with the same force and effect as if set forth in full below.

72. This cause of action is an offshoot of the general duty of loyalty owed by partners and upper-level management employees, and it precludes such persons from diverting unto themselves opportunities which in fairness ought to belong to the partnership and its partners.

73. Defendant Troxel was the Managing Partner of TKC LLP and as such owed a duty to TKC LLP and its partners, including Plaintiff Dr. Piacentile, to avoid diverting unto himself opportunities which in fairness ought to belong to TKC LLP and its partners.

74. Despite this duty, Troxel surreptitiously established a competing law firm, Troxel LLP/Troxel LLC, of which Dr. Piacentile is not a partner/member, and diverted clients and revenues from TKC LLP to Troxel LLP/Troxel LLC.

75. Troxel has failed to compensate Dr. Piacentile for the opportunities he diverted from TKC LLP to Troxel LLP/Troxel LLC.

76. As a consequence of the foregoing, Dr. Piacentile has suffered and will continue to suffer irreparable harm and loss, primarily through the diversion of valuable partnership opportunities from TKC LLP to Troxel LLP/Troxel LLC.

WHEREFORE, Dr.Piacentile requests judgment in his favor and against Defendant Troxel in an amount to be determined at trial, exclusive of interests, reasonable attorneys fees, and costs.

## COUNT VI
## BREACH OF FIDUCIARY DUTY OF LOYALTY
### Against Jeremy Troxel Only

77. The allegations of Paragraphs 1 through 76 are incorporated by reference herein with the same force and effect as if set forth in full below.

78. Partners in a limited liability partnership owe each other a general duty of loyalty which precludes such partners from, among other things, diverting unto themselves opportunities which in fairness ought to belong to the partnership or otherwise taking actions to harm the interests of their partners in order to further their own personal interests.

79. Defendant Troxel was the Managing Partner of TKC LLP and as such owed a duty of loyalty to TKC LLP and its partners, including Plaintiff Dr. Piacentile, to avoid diverting unto himself opportunities which in fairness out to belong to TKC LLP.

80. Despite this duty, Troxel surreptitiously established a competing law firm, Troxel LLP/Troxel LLC, of which Dr. Piacentile is not a partner/member, and diverted clients and revenues from TKC LLP to Troxel LLP/Troxel LLC.

81. Troxel has failed to compensate Dr. Piacentile for the opportunities he diverted from TKC LLP to Troxel LLP/Troxel LLC.

82. As a consequence of the foregoing, Dr. Piacentile has suffered and will continue to suffer irreparable harm and loss, primarily through the diversion of valuable partnership opportunities from TKC LLP to Troxel LLP/Troxel LLC.

WHEREFORE, Dr. Piacentile requests judgment in his favor and against Defendant Troxel in an amount to be determined at trial, exclusive of interest, reasonable attorneys' fees, and costs.

## COUNT VII
## FRAUD IN THE INDUCEMENT
### Against Jeremy Troxel Only

83. The allegations of Paragraphs 1 through 82 are incorporated by reference herein with the same force and effect as if set forth in full below.

84. As evidenced by his immediate disregard for all terms of the TKC Settlement Agreement, Troxel never intended to be bound by the TKC Settlement Agreement and instead fraudulently induced and deceived Dr. Piacentile to enter into the settlement arrangement for Troxel's own pecuniary benefit and to Dr. Piacentile's detriment.

85. Specifically, Troxel gained the benefit of receiving a percentage cut of certain cases at WBI that he was not otherwise entitled to, in exchange for his cooperation with the wind-down of TKC LLP.

86. Troxel also gained the recognition, by Dr. Piacentile, of a purported monetary investment which Troxel claimed to have made in TKC LLP, but for which he provided no documentary support. Dr. Piacentile recognized this purported investment as part of a holistic settlement that was meant to benefit all parties.

87. Troxel had no present intention of carrying out the TKC Settlement Agreement at the time of its negotiation and execution. This was all a ruse to obtain further economic benefits and gains from Dr. Piacentile.

88. Dr. Piacentile's reliance on Troxel's purported good faith intent to comply with the TKC Settlement Agreement at the time of execution was reasonable. The TKC Settlement Agreement was negotiated at arms length through outside counsel. Troxel gave no indication that he intended to immediately abandon the terms of the settlement arrangement that he spent months negotiating.

89. As a result of Troxel's fraudulent inducement of Dr. Piacentile, the TKC Settlement Agreement should be stricken as null and void.

WHEREFORE, Dr. Piacentile requests judgment in his favor and against Defendant Troxel in an amount to be determined at trial, exclusive of interest, reasonable attorneys' fees, and costs.

## **JURY TRIAL DEMAND**

Trial by jury is demanded as to all eligible issues.


Dated: July 10, 2020                                By  /s/ David S. Stone
                                                     David S. Stone
                                                     STONE & MAGNANINI LLP
                                                     100 Connell Drive, Suite 2200
                                                     Berkeley Heights, NJ 07922
                                                     Tel:  (973) 218-1111
                                                     Fax: (973) 218-1106
                                                     dstone@stonemagnalaw.com
                                                     *Attorneys for Plaintiff*